Lawrence M. Meadows
P.O. Box 4344
Park City, UT 84060
Phone: 516-982-7718
Facsimile: 435-604-7850
lawrencemeadows@yahoo.com
PRO SE

FILED
U.S. DISTRICT COURT

2014 FEB 19  A 8: 59

DISTRICT OF UTAH

BY:_____
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| **LAWRENCE M. MEADOWS,** | Case: 2:14–cv–00115 |
| Plaintiff, | Assigned To : Furse, Evelyn J. |
| | Assign. Date : 2/19/2014 |
| v. | Description: Meadows v. Allied Pilots Association et al |
| **ALLIED PILOTS ASSOCIATION,** | **VERIFIED COMPLAINT** |
| a Texas Labor Association, and | |
| **AMERICAN AIRLINES, INC.,** | |
| a Delaware Corporation, | **JURY TRAIL DEMANDED** |
| Defendants. | |

     **COMES NOW**, the Pro Se Plaintiff, Lawrence M. Meadows, who hereby, files the following Complaint to sue Defendant's and states as follows:

### I.   JURISDICTION AND VENUE

1.       Plaintiffs' claims are filed  pursuant to 28 U.S.C. § 1331 and § 1337(a) in that this suit seeks to enforce the Railway Labor Act ("RLA"), an Act of Congress regulating Commerce.  Venue is proper under 28 U.S.C. § 1391 in that defendants have either

1
VERIFIED COMPLAINT

substantial contacts, or, with respect to the Allied Pilots Association has members in the state of Utah; and the plaintiff resides in the state of Utah and is subject to personal jurisdiction.

## II.   PARTIES

2.　　　Plaintiff, Lawrence M. Meadows resides in Utah, is a member of defendant Allied Pilots Association, and a pilot *"employee"* of defendant American Airlines, Inc., as defined under U.S.C 45 §151- Fifth. Railway Labor Act

3.　Defendant, Allied Pilots Association (hereinafter "APA" or "Union"), is an unincorporated association, and labor organization, headquartered in Texas, with members in Utah, and is the exclusive "representative" of all pilots at American Airlines, Inc., as defined under 1 Sixth of the RLA, 45 U.S.C. § 151.Sixth. At all relevant times APA was the collective barraging agent for Plaintiff.

4.　　　Defendant, American Airlines, Inc (hereinafter "American Airlines", or "Company"), is a foreign corporation with substantial business contacts in Utah and every other state in the United States, and is an air "carrier" under RLA § 1 First, 45 U.S.C. §151 First. As such, American Airlines is a required party under Rule 19(a), Fed. R. Civ. P., as it is mutually responsible for establishment of a System Board of Adjustment under the authority of RLA § 204, 45 U.S.C. § 184.

## III.   STATEMENT OF FACTS

5.　　　Plaintiff, Lawrence M. Meadows brings this hybrid action against his former employer, American Airlines, Inc, and his representative the Allied Pilots Association, for violations of his rights pursuant to the Railway Labor Act, 45 U.S.C. § 151 et seq.

6.      The Railway Labor Act was originally enacted un 1926 to govern labor-employment relations is the rail industry, and was designed to, among other things, "provide for the prompt an orderly settlement of all disputes growing of grievance or out of the interpretation or application of collective bargaining Agreements [CBA]."

7.      Unlike other industries where the right to arbitrate grievances is established in the collective bargaining agreement, the source for grievance arbitration in the railroad and airline industries is statutory. Section 3 of the Railway Labor Act (45 U.S.C. §153) addresses the railroad industry, and Section 204 (45 USC §184) covers the airline industry. The primary difference between the two sections relates to the structure of the arbitral panels. Despite the fact that Section 201 specifically provides that Section 3 does not apply to air carriers, many aspects of railroad arbitration have been applied to the airlines.

8.      Plaintiffs' alleges that; 1) his *"carrier",* American Airlines terminated him without cause, and removed him from the Pilot System Seniority List in violation of the Collective Bargaining Agreement (CBA); 2) That both Defendant's denied Plaintiff of his individual statutory right to have his grievance claims arbitrated before System Board of Adjustment under RLA Sec. 204 (§184.); and 3) That his *"representative"*, the Allied Pilots Association, breached its duty of fair representation of Plaintiff, wherein it processed his grievance in a perfunctory manner, and also exhibited animus and hostility toward plaintiff, when it subsequently refused to arbitrate his company termination grievance claim before a System Board of Adjustment.

## BACKGROUND

### Employment History

9.      Plaintiff, graduated cum laude from Embry-Riddle Aeronautical University in
1985, with a B.S. Degree in Aeronautical Engineering. Upon graduation, he became a
commissioned officer in the U.S. Air Force, and served on active duty as a military pilot
flying T-37, T-38, and C-9A aircraft, until he was honorably discharged in 1991.

10.     Plaintiff was hired by as a pilot employee by American Airlines in Oct. 1991,
where flew DC-10, B-727, MD-11, and B-777 aircraft.

11.     Since his date of hire Plaintiff has continuously been an member in good standing
of his pilots' union (Exhibit 1); and as a member of the craft or class of pilots employed
by American, APA owes him a Duty of Fair Representation under the Railway Labor
Act.

### Disability History

12.     Starting in Jun. 2004, Plaintiff suffered from a debilitating illness, which prevents
him from obtaining the needed FAA medical certification to perform his duties as a pilot.

13.     Therefore, American Airlines Corporate Medical Director approved Plaintiff for
the pilot long term disability benefits provided for under the CBA, which were funded by
the Company's *"Pilot Retirement Benefit Program" ("Program")*.

14.     Regardless, to date Plaintiff continuously has remained a *"Participant"* under
the terms of the *"Program"*, and was entitled to receive, and accrue full pension Credited
Service; based his uninterrupted service in an eligible statuses of either, *"Active Pilot
Employee"* on the *"Pilot System Seniority List"*, *"Unpaid Sick Leave of Absence
(USLOA)"* as approved by the Corporate Medical Director, or on a Disability benefit
defined under the *"Program"*.

15.     On December 26, 2007, AA's Corporate Medical Director, without cause or notice, abruptly terminated Plaintiff's  then existing disability benefits under the  old pension funded "Program";  and unilaterally placed him in an approved "USLOA" status.

16.     Plaintiff timely filed an Administrative Appeal to American Airlines Pension Benefits Administration Committee (PBAC), who reviewed and denied his disability claim through third party disability claims evaluator, Western Medical Evaluators (WME) on June 8, 2008.

17.     Supplement-F of the pilot's CBA, Supp-F   required that all disability claim disputes be referred to a *"Clinical-source"*;  but AA and APA violated this clause of the CBA, because WME was nothing more than an administrative medical billing service.

18.      After  two years of waiting, and APA's failure to resolve his disability dispute, Plaintiff timely filed an individual  ERISA disability  lawsuit against American Airlines in U.S. District Court,  of the Florida Southern District (FLSD).

19.     On March 23, 2011, the Plaintiff  was allowed to conduct special court ordered depositions of AA's Chief  Nurse, and Senior Budget Analyst.

20.     Based on those depositions, and AA's last minute, untimely production of documents;  the Plaintiff,  discovered the existence of secret *"Pilot Disability Nurse Case Management Cost Savings"* reports; which were used by American Airline's Medical Department to fraudulently deny and/or terminate  rightful pilot disability benefits based on cost saving alone.

21.     These reports showed that 421 pilots were receiving disability benefits; and  that during Dec. 2007 Plaintiff was  one of 84 pilots being tracked and targeted for cost savings.

VERIFIED COMPLAINT

22.    The very next day On March 24, 2011, before all the evidence was in the record, FLSD Court abruptly entered Final Summary Judgment order in favor of AA.

23.    Shortly thereafter, Plaintiff also discovered that AA's third party disability claims reviewer, WME used in furtherance of AA's *"Pilot Disability Nurse Case Management Cost Savings"* scheme, was shut down for felony medical claim fraud.

24.    WME was not a *"Clinical-source"* as required under the CBA, but instead was a tiny 6 employee medical billing service that was rife with fraud and procedural irregularities; "WME's" corporate medical director medical license had been revoked by the Texas Medical Board, it's office manager was a convicted felon, and it's principals fabricated and forged doctors evaluation reports.

25.    Eventually WME was shuttered, and its principals charged with felony medical claim fraud, sentenced to confinement, and forced to pay fines and restitution.

26.    Just recently Plaintiff discovered documents that show American Airlines terminated WME's contract on Aug. 8, 2008, within one day of its principles being indicted for felony medical claim fraud.

27.    American Airlines or APA never subsequently offered Plaintiff a proper claim re-review by the WME's replacement, the Mayo Clinic.

28.    In mutually selecting WME, a medical billing service, both American Airlines and APA violated the CBA, by failing to provide its disabled pilots a full and fair review of their disability claims by a "Clinical-source" as required under Supplement-F.

29.    American Airlines and APA also breached their fiduciary to duty by failing to exercise proper due diligence, when mutually selecting WME, which was in fact a procedurally flawed and fraudulent disability claims reviewer.

VERIFIED COMPLAINT

30.      In April 2011, Plaintiff timely filed a Notice of Appeal with the 11th Cir. , and a Rule 59 with the FLSD based the newfound evidence, but the FLSD denied said motion, due to lack of jurisdiction.

31.      Just a couple of days after Plaintiff exposed that American Airlines was a conflicted fiduciary;  which was attempting to aide with the gross underfunding of its pension plans, by implementing the secret *"Pilot Disability Nurse Case Management Cost Savings"* scheme, facilitated through a fraudulent claims reviewer. American Airlines  retaliated, and  attempted to  punish Plaintiff, by falsifying meet and confer certifications in order to file untimely and unmeritorious costs and attorney's fee motions totaling $52,680.20.

32.      Subsequently, Plaintiff filed a Rule 11 motion; and the FLSD Court struck American Airlines  pleadings, and denied its cost and attorney's fee motions as moot.

33.      In June 2011,  based on his ERISA disability suit denial,  and American Airlines steadfast refusal to acknowledge his disabling condition; Plaintiff,  mailed  a certified request to American Airlines Corporate Medical Director,  requesting Fitness For Duty Exam  and issue a  Return to Work (RTW) clearance, as provided by Sec. 20 of the CBA.

34.      The Corporate Medical director never responded, and ignored said request.

### Plaintiff Engaged in Protected SOX-WB Activity

35.      Based on  American Airlines  pilot disability cost savings scheme, implemented through the use of  WME,  Plaintiff reasonably believed American Airlines  was intentionally  underfunding pilot's rightful  disability pension funding obligations, which thereby artificially inflated its corporate earnings reported on their financial statements.

Which for publically traded company , gives rise to SEC securities fraud under the Sarbanes-Oxley (SOX) Act.

36.     On Jul 18, 2011, based on his reasonable belief of SOX fraud, Plaintiff engaged in protected whistleblower activity, and reported the fraudulent cost savings scheme to American Airline's managers and counsel; and eventually, on Sep. 12, 2011, he filed a formal SOX-Whistleblower (SOX-WB) Complaint with OSHA.

37.     Coincidentally, now that American Airlines bankruptcy stay has been lifted; just two weeks ago the Department of Labor docketed Plaintiff's SOX-WB Complaint for an ALJ hearing on June 9, 2014 in Salt Lake City, Utah.

### Plaintiff's Termination - Removal from Seniority List - 2nd Disability Claim

38.     On Aug. 5, 2013, merely two weeks after Plaintiff engaged in protected SOX - Whistleblower activity;   American Airlines  sent a certified letter threatening to terminate his employment; and refused to acknowledge existence of his disabling condition, and denied his requests for a Reasonable Accommodation. Two months thereafter, American Airlines ultimately terminated him without cause.

39.     On Sep. 14, 2011, to defend against the threat of termination, Plaintiff at his own expense underwent a clinical examination at AA's then new disability claims reviewer, the Mayo Clinic. Who verified the continuous existence of his disabling illness.

40.     During that time-frame Plaintiff remained on the American Airlines' *"Pilot System Seniority List",* and was considered an *"Active Pilot Employee"* on an *"Authorized Leave of Absence",* who received compensation from the Company. As such he met eligibility criteria for disability benefits under the new *"PLTD Plan".* (Exhibit 3).

41.     On Oct. 1, 2011,  using Mayo's evaluation, Plaintiff submitted a renewed disability benefits claim under the *"PLTD Plan"*. Which American Airlines subsequently approved, albeit with benefit payments commencing on Dec. 13, 2011; thereby denying him of four years of retroactive payments.

42.     On Nov. 4, 2011, in complete disregard of the Plaintiff's SOX-WB protections, and his pending disability benefits claim; American Airlines administratively terminated Plaintiff's employment,  removed him from the *"Pilot System Seniority List"* in violation of the Sec. 13 of the CBA, and revoked Plaintiff's lifetime non-revenue travel benefits.

43.     Despite American Airlines and APA's contentions  that Plaintiff was terminated; he is currently still on  the Company's payroll, receiving his pilot disability benefits in the form of W-2 employee wages subject to Federal Income Tax withholding. As such he is considered both an *"Employee"* and *"Pilot Employee"* as defined under the terms of the *"PLTD Plan"* I.d

### Plaintiff  Files his 1st Company Termination Grievance #12-011

44.     In response, on Feb. 4, 2012 Plaintiff timely filed company termination grievance #12-011 (Exhibit 4) in accordance with Sec. 21 of the CBA , citing his improper discharge and removal from the seniority list in violation of the CBA; along with violation of his SOX-WB protections, and failure to offer a Reasonable Accommodation under the American's with Disabilities Act (ADA).

45.     On July 10, 2013, APA filed a Proof of Claim for  Meadows grievance in American's bankruptcy proceedings, preserving all damages flowing from that grievance.

46.     Further,  on Dec. 7, 2012, APA specifically preserved Plaintiff's grievance #12-011, as one of the only 39 most meritorious, out of  220 open grievances; as shown in

exhibit 1 of the APA-AA Settlement Consideration and Bankruptcy Protections agreement. (Exhibit 5).

47.     Despite Plaintiff's filing his grievance directly with his base chief pilot (1st step), APA bypassed that hearing, and it was first heard directly as appeal grievance (2nd step) by the Vice President of the Flight Department on April 25, 2013.

48.     APA staff attorney, Chuck Hairston was assigned to process Plaintiffs grievance, and attended the hearing; but bluntly told Plaintiff he was not representing his interests to the extent they weren't aligned with APA's, but instead representing the interests of APA. Thereby, forcing the Plaintiff to write and present his own brief.

49.     Further, just prior to the hearing, Mr. Hairston told Plaintiff that APA would not go anywhere near the issues in his brief related fraudulent disability claims reviewer Western Medical Evaluators, or the reasonable accommodation. He did however, say that APA would support the SOX portion of his grievance

50.     Previously unknown to Plaintiff until just recently was the fact that Mr. Hairston , was the very same APA staff attorney who responsible for mutually selecting fraudulent disability claims reviewer WME. The very same company that denied Plaintiffs first disability benefits claim.

51.     Mr. Hairston therefore had s a direct conflict of interest in the outcome of Plaintiffs grievance. Thus, APA breached its duty to Plaintiff by processing his grievance using conflicted counsel. See *Automobile Workers, Local 600*, 225 NLRB 1299, 93 LRRM 1233 (1976), *"A potential conflict of interest between grievant and their Union representatives does not constitute a breach of the duty <u>unless</u> the representative has a personal stake in the outcome that is contrary to the grievant' interest."*

52.     On Jun 6, 2013 American Airlines denied Plaintiff's grievance, re-asserting its decision under Sec. 11 of the CBA. (Exhibit 6).

53.     In response, on June 28, 2013, APA's President, Keith Wilson notified American Airlines in writing that he was, *"protesting the Company's action of removing him from the seniority list and discharging him from American Airlines."*, and escalated Plaintiffs grievance to a Pre-Arbitration Conference (PAC) (3rd step). (Exhibit 7).

54.     The PAC was held on Aug. 6, 2013. APA counsel, required Plaintiff to draft and submit his own settlement brief. Wherein he offered a global settlement in exchange for, 1) Reinstatement to the seniority list, 2) Restoration of his non-revenue travel benefits, and 3) Reasonable accommodation to another position within his bargaining unit, but the Company declined to settle.

55.     On Aug. 21, 2013 after the PAC declined settlement; Plaintiff made a written request to APA, asking, *"I respectfully request the Association President appeal my grievance 12-011 to the System Board of Adjustment for a final review."* (Exhibit 8).

56.     Over 18months after filing, preserving, hearing, and appealing grievance #12-011 to the 3rd step of a PAC; APA counsel suddenly informed Plaintiff it did not believe his grievance raised any contractual violations, because it was only based on statutory claims (under SOX and the ADA), and therefore APA would not be arbitrating it.

57.     Based on APA's 11th hour refusal to arbitrate, what they had preserved as a meritorious grievance in the bankruptcy; it now appears APA was simply going through the motions; but, a *"Union may not arbitrarily ignore a meritorious grievance or process it in a perfunctory fashion."* See *Vaca v. Sipes,* 386 U.S. 171, 64 LRRM 2369 (1967).

58.     On Aug. 29, 2013, the APA President, Keith Wilson wrote Plaintiff and stated
he was refusing Plaintiff's request to arbitrate his grievance at System Board. (Exhibit 9).

59.     On Sep. 18, 2013, Plaintiff via certified wrote APA's President, stating "*I
respectfully ask you to reconsider your decision and appeal my grievance to a System
Board before the 30 day deadline to do so expires on tomorrow.*" (Exhibit 10).

60.     Plaintiff, followed up via email and telephone, but the APA President never
responded, and ignored his request to reconsider appealing his grievance to a System
Board. APA director of legal

61.     Plaintiff believes APA's last minute refusal to arbitrate his grievance, was
because of personal animus and hostility; in retaliation for cross-examining APA Officers
and Committee Members for 4 hours, during the Equity Dispute Arbitration in July 2013.

## APA's Arbitrary Treatment of Plaintiff's Equity Distribution

62.     As part of the AA-APA Bankruptcy Settlement Agreement, APA was charged
with distributing approximately $1B in equity to each of its 8,400 members or roughly
$100,000 plus per pilot.

63.     APA's Equity Distribution Committee (EDC) created Eligibility and Distribution
Methodology rules,; under which Plaintiff was clearly entitled to a full payout from all
four equity silos, or about $130,000, based on pilots of similar seniority and service.

64.     However, in Plaintiff's case the EDC did not follow its own distribution rules, and
instead said it "*looked at the totality of the situation...*"; and manually adjusted Meadows
status, and gave him only a partial payout from just two of the four silos, which amounted
to only $35,459.96.

65.     APA's EDC website also contained data errors incorrectly showing plaintiff only had 17.5 years of Pension Credited Service, as opposed to correct amount of 20 years. Which not only significantly reduced his equity payout, but also reduced his annual pension annuity by $4, 265.72/yr.

66.     Plaintiff filed a formal APA Equity Distribution Challenge, which was heard by Arbitrator Stephen Goldberg on July 13, 2013; where amongst other things he argued that APA refused to correct data errors related to his status and years of pension credited service, and ignored his full eligibility status. Arbitrator Goldberg directed APA to correct all data errors and notify the affected pilots, and specifically FO Meadows

67.     On Jul 30, 2013, APA filed its closing brief and stated, *"American recently undertook a review of the data it had provided to APA and made certain adjustments as a result. On July 23, 2013 APA notified all pilots whose data had been updated."* However, APA never informed,  nor contacted Meadows regarding his data error dispute.

68.     On Aug 8, 2013 Plaintiff sought assistance from the APA Benefits Coordinator to follow-up with American to ensure he received the full adjustment of Credited Service.

69.     However, nine days later,  APA's Benefits Coordinator, advised him,  *"A-Plan [Pension] statements will be mailed <u>sometime first quarter of next year</u>.  If you are not retiring before then, I would suggest you wait until you receive that statement to see if they have given you updated credited service."*

70.     Had Plaintiff waited until the 1st quarter of 2014, he would have lost any benefit of his Credited Service adjustment for purposes of receiving a full equity payout.

71.     Plaintiff then took it upon himself to contact American Airlines, and successfully obtained adjustment to his Credited Service; of which he gave formal notice to APA and the Arbitrator of the adjustment, and requested recalculation of his equity payout.

72.     Shortly thereafter, APA staff attorney Mark Meyers, filed a formal Response to the Arbitrator, which it posted on a public website; attaching Plaintiff's confidential emails between himself and APA's counsel, which contained his personal financial and medical data. I

73.     In that Response, APA also made an untimely attempt to reargue to the Arbitrator why Plaintiff should only receive a partial equity payout of two silos, instead of all four.

74.     On Sep.16, 2013, Plaintiff demanded APA withdraw his confidential emails contained within its pleading from the website, and APA subsequently did so.

75.     On Sep 27, 2013, Plaintiff sent a renewed request to APA as his bargaining agent, seeking help to secure him a reasonable accommodation within his barraging unit, as requested during in his grievance and during his PAC.

76.     On Oct.04, 2013, APA legal director, Bennett Boggess, responded in a letter and stated, *"APA has no role to play in requests for accommodation of the type you seek."*, Thereby, ignoring its duties under the ADA, and allowing the Company to *"direct-deal"* with APA members on reasonable accommodation requests.

77.     Further, while Plaintiff's grievance was still pending, Arbitrator Stephen Goldberg's Decision and Award on the APA Equity Dispute held that, *"it is arbitrary for APA to treat pilots who have a TAG* [Terminated Awaiting Grievance] *Grievance as sufficiently likely to be successful..., while treating differently pilots who have a non-TAG grievance that challenges an administrative termination."*, and further that, *"APA*

*ignores the fact that it is advocating for FO Meadows...", and "Nor is there record evidence that a grievance seeking reinstatement to active duty is more likely to be successful than a grievance seeking reinstatement to the seniority list."* (Exhibit 11).

78.     Arbitrator Goldberg, ruled that, *"FO Meadows Challenge is sustained and APA will be directed to make him eligible for a full share distribution from all four silos." I.d.* Which amounted to $130,892; over $100k more than APA had improperly calculated.

79.     The only other pilots whom Arbitrator Goldberg only awarded extra equity payouts were other similar situated disable pilots, because he found they too were treated arbitrarily. Not to mention the perceived disability discrimination these pilots also suffered as a result of APA ADA violations.

### Plaintiff's files his 2nd Company Termination Grievance #13-064

80.     On Oct 11, 2013, Plaintiff asked his Union base representative to a file a new grievance (eventually #13-064) (Exhibit 12), on behalf of himself and all similar situated pilots at the base; wherein he explicitly grieved that the Company was abrogating his pilot seniority and administratively terminated him in violation the Sec. 11 and 13 of the CBA .

81.     By Oct, 31, 2013, APA still had  ignored his request. So, Plaintiff individually filed his new grievance #13-064,  as an appeal directly to  the V.P. of Flight.

82.     However on Nov.18, 2013, the Company, responded that to the extent he was trying to update or amend his previous grievance, that they would reserve the right to object, but Plaintiff responded that this was intended to be an entirely new grievance.

83.     Finally, On Dec. 13, the Company sent a certified mailing, directing the Plaintiff to contact APA to schedule  grievance #13-064 for a hearing.

84.    That same day APA staff attorney, Mr. Chuck Hairston contacted Plaintiff to schedule a hearing for the new grievance now designated #13-064; but explicitly stated he is not a member, APA does not represent him, and APA owes him no duty. Further, Mr. Hairston said he would attend the hearing to only represent APA's own interests.

85.    Grievance #13-064 is now scheduled to be heard as an appeal grievance (step 2) with the V.P. of the Flight Department on Feb. 27, 2014. Since APA has abandoned representation Plaintiff will be forced to write his own brief and argue it without any APA support.

86.    Plaintiff is therefore filing this complaint now, so as to be timely within the 180 day SOL, or Feb. 25, 2014; as calculated from APA's written refusal to arbitrate previous grievance #12-011 on Aug. 29, 2013.

87.    Given APA's adversarial posture, and its statement that it does not support Plaintiff's current grievance #13-064, it is now clear that they will also refuse to arbitrate it; thus, waiting on its final disposition is futile.

88.     However, once the new grievance is resolved or denied; if new facts warrant, Plaintiff reserves his right to amend this complaint as allowed under F.R.C.P 15.

### IV.  COUNT I: Compel Arbitration of Plaintiffs Grievances

89.    Plaintiff incorporates by reference the foregoing paragraphs as fully set forth herein.

90.    The Plaintiff currently receives a collectively bargained disability welfare benefit under the *"PLTD"* Plan, negotiated under the CBA, whose benefits are paid as W-2 Employee wages. Further he is defined as both an *"Employee"* and *"Pilot Employee"* under the terms of the *"PLTD Plan"*. *I.d.*

ic
VERIFIED COMPLAINT

91.     As such, Plaintiff, Lawrence M. Meadows is an both employee of the defendant air carrier, American Airlines; and also member of the craft or class of Pilots which his defendant Union represents.

92.     Unlike other industries where the right to arbitrate grievances is established in the collective bargaining agreement, <u>the source for grievance arbitration in the railroad and airline industries is statutory</u>.(Emphasis added). Section 3 of the Railway Labor Act (45 USC §153) addresses the railroad industry, and Section 204 (45 USC §184) covers the airline industry. The primary difference between the two sections relates to the structure of the arbitral panels. Despite the fact that RLA Section 201 (45 U.S.C. §181) specifically provides that Section 3 does not apply to air carriers, many aspects of railroad arbitration have since been applied by the Federal Courts to the airlines.

93.     Plaintiff filed grievance claims protesting his improper discharge and removal from the seniority list, which are considered a minor dispute under the Railway Labor Act, 45 U.S.C. § 151 et seq.; as it is a grievance which flows from the interpretation or application of the collective bargaining agreement (CBA).

94.     The RLA, provides that all minor disputes arising between an employee and a air carrier under Section 3 (45 U.S.C. §153), be handled in usual manner under Section 204 (45 U.S.C. §184).  and arbitrated to System Board of Adjustment under the Railway Labor Act.

95.     The distinction between major and minor disputes is significant. While federal courts have broad powers to intervene in some major disputes, minor disputes must be resolved through arbitration in a grievance proceeding or before a System Board of Adjustment. See 45 U.S.C. § 184. See *Caparo v. United Parcel Service Co.*, 993 F.2d

328, 331(3d Cir. 1993), which recognized, *"the RLA reflects a clear decision by Congress that minor disputes should be arbitrated, and not litigated." See also. Assoc. of Flight Attendants, AFL-CIO v. USAir, Inc.*, 960 F.2d 345, 347 (3d Cir.1992) *("Congress placed great emphasis on negotiation and voluntary settlement rather than judicial resolution of labor disputes under the RLA.").*

96.     Additionally,  the RLA also reflects a strong congressional interest in seeing that employees are not left *"remediless"* and without a forum to present their grievances. Cf. *Vaca v Sipes*, 386 U.S. 171, 185-86, 87 S.Ct. 903, 914, 17 L.Ed.2d 842 (1967).

97.     Further,  the  Eleventh Circuit has also expressly recognized, that 45 U.S.C. § 184 <u>establishes the individual statutory right of an air industry employee to compel arbitration before the adjustment board established by his union and employer.</u> (Emphasis added). See *Pyles v. United Airlines, Inc.*  79 F.3d 1046 (11th Cir. 1996); wherein the court explained in a footnote why i*t "believed"* that airline employees have a statutory right to pursue claims before a board of adjustment without union assistance. *See id.* at 1052, n. 9.

98.     <u>As such, the Plaintiff enjoys an absolute individual statutory right to arbitrate a grievance,</u> under the RLA Part I, Section 3 (45 U.S.C. §153), which courts have extended to RLA Part II, Section 204 (45 U.S.C. §184). (Emphasis added).

99.     *"While agreement is not compulsory, the steps required under the RLA are. In the event that either party refuses to follow the plain mandate of Congress, and breached  the duty which Congress has impose upon it."*  <u>Injunctive Relief, is required to *"vindicate the processes of the Railway Labor Act"*</u>,  *Brotherhood Railroad Trainmen v. Chicago River & Indiana R.R  Company*  353U.S (1957). at page  4177 Sect. at page 641*, "without*

*which the act would be a nullity." American v. ALPA,* 1969F Supp. 777. (1958)
(Emphasis Added).

100.    Unless American Airlines and APA's breaches of duty are rectified, the Plaintiff will continue to suffer substantial damages stemming from his lost rights under the RLA; including but not limited the loss of his right to have his grievance arbitrated, which can provide "make whole" remedies of back pay and benefits, reinstatement to the pilot seniority list, or forward pay and benefits in lieu of reinstatement.

101.    Finally, the federal court in *Capraro v. United Parcel Service Co.* 993 F.2d 328 (3rd Cir. 1993), held that, *"if an air carrier [or representative] refuses to participate in a Board of Adjustment proceeding, by refusing to hear an employee's individual claim, that employee is entitled to a judicial order compelling arbitration."* (Emphasis added)

102.    Accordingly, the **Plaintiff respectfully seeks this Court to compel both Defendants to submit plaintiff's grievances to the American/APA System Board of Adjustment (SBA) for a hearing and final and binding resolution by a neutral arbitrator.**

103.    Resolution by the neutral, rather than majority vote by the SBA, is required given American Airlines unethical and fraudulent treatment related to Plaintiffs disability and termination, coupled with APA's animus and hostility.

## V.  COUNT II: APA Breached its Duty of Fair Representation

104.    Plaintiff incorporates by reference the foregoing paragraphs as fully set forth herein.

105.    The Plaintiff currently receives a collectively bargained disability welfare benefit under the *"PLTD Plan",* negotiated under the CBA, whose benefits are paid as W-2

Employee wages. Further he is defined as both an *"Employee"* and *"Pilot Employee"* under the terms of the *"PLTD Plan". I.d.*

106.    As such the Plaintiff, Lawrence M. Meadows is an both "employee" of the defendant air carrier, American Airlines, and also member of the  defendant union representative , the Allied Pilots Association (APA).

107.    Unlike other industries where the right to arbitrate grievances is established in the collective bargaining agreement, the source for grievance arbitration in the railroad and airline industries is statutory. (Emphasis added).  Section 3 of the Railway Labor Act (45 USC §153) addresses the railroad industry, and Section 204 (45 USC §184) covers the airline industry. The primary difference between the two sections relates to the structure of the arbitral panels. Despite the fact that RLA Section 201 (45 U.S.C. §181) specifically provides that Section 3 does not apply to air carriers, many aspects of railroad arbitration have since been applied by the Federal Courts to the airlines.

108.    Plaintiff filed a grievance claims protesting his improper discharge and removal from the seniority list, which  is considered a minor dispute under the Railway Labor Act, 45 U.S.C. § 151 et seq.;  as it is a grievance which flows from the interpretation or application of the collective bargaining agreement (CBA).

109.    The  RLA, provides that all minor disputes arising between an employee and a air carrier  under Section 3 (§153), be handled in usual manner under Section 204 ( §184). and arbitrated to System Board of Adjustment under the Railway Labor Act.

110.    The distinction between major and minor disputes is significant. While federal courts have broad powers to intervene in some major disputes, minor disputes must be resolved through arbitration in a grievance proceeding or before a System Board of

Adjustment. See 45 U.S.C. § 184. See. *Caparo v. United Parcel Service Co.*, 993 F.2d 328, 331(3d Cir. 1993), which recognized, "*the RLA reflects a clear decision by Congress that minor disputes should be arbitrated, and not litigated.*" *See also. Assoc. of Flight Attendants, AFL-CIO v. USAir, Inc.*, 960 F.2d 345, 347 (3d Cir.1992) *("Congress placed great emphasis on negotiation and voluntary settlement rather than judicial resolution of labor disputes under the RLA.*").

111.  Additionally,  the RLA also reflects a strong congressional interest in seeing that employees are not left *"remediless"* and without a forum to present their grievances. Cf. *Vaca v. Sipes*, 386 U.S. 171, 185-86, 87 S.Ct. 903, 914, 17 L.Ed.2d 842 (1967).

112.  Further,  the  Eleventh Circuit has also expressly recognized, that 45 U.S.C. § 184 <u>establishes the individual statutory right of an air industry employee to compel arbitration</u> <u>before the adjustment board established by his union and employer</u>. (Emphasis added). See *Pyles v. United Airlines, Inc.*  79 F.3d 1046 (11th Cir. 1996); wherein the court explained in a footnote why i*t "believed"* that airline employees have a statutory right to pursue claims before a board of adjustment without union assistance. *See I.d.* 1052, n. 9.

113.  Moreover, APA itself argued on appeal on behalf of its member, pilot Jason Whitaker , in *Whitaker and Allied Pilots Association, Plaintiffs-Appellants, v. American Airlines, Inc.* (11th Cir. Mar, 2002),  *" that 45 U.S.C. § 184 establishes the individual* *right of an air industry employee to compel arbitration before the adjustment board* *established by his union and employer."* (Emphasis added), contending that the Eleventh Circuit has expressly recognized this right in *Pyles supra.*

114.     <u>As such The Plaintiff enjoys an absolute individual right to arbitrate a grievance,</u> <u>under the RLA</u> Part I Section 3, §153, which courts have extended to part II, §184; which his union, APA, is on record as supporting such in *Whitaker I.d.*(Emphasis added).

115.     Further, while Plaintiff's grievance was still pending, Arbitrator Stephen Goldberg's Decision and Award on the APA Equity Dispute held that, *"it is arbitrary for APA to treat pilots who have a TAG* [Terminated Awaiting Grievance] *Grievance as sufficiently likely to be successful..., while treating differently pilots [Meadows] who have a non-TAG grievance that challenges an administrative termination.",* and further that, *"APA ignores the fact that it is advocating for FO Meadows...",* and. *"Nor is there record evidence that a grievance seeking reinstatement to active duty is more likely to be successful than a grievance seeking reinstatement to the seniority list." I.d.*

116.     Ever since, defendant APA has demonstrated an animus and hostility towards Plaintiff, and recently APA staff explicitly stated it does not represent or owe the Plaintiff any duty.

117.     As a result, of APA's arbitrary, discriminatory and bad faith refusal to arbitrate Plaintiffs grievance before a System Board; they have deprived him of his individual statutory to arbitrate said grievance.

118.     Additionally, the APA staff attorney, Mr. Chuck Hairston, who handled Plaintiffs grievance was also responsible for mutually selecting fraudulent disability claims reviewer WME on behalf of APA. This gives rise to s a direct conflict of interest in the outcome of Plaintiffs grievance, and therefore is also a breach of APA's duty. See *Automobile Workers, Local 600*, 225 NLRB 1299, 93 LRRM 1233 (1976), *"A potential conflict of interest between grievant and their Union representatives does not constitute a*

*breach of the duty <u>unless</u> the representative has a personal stake in the outcome that is contrary to the grievant's interest."*

119.　　APA processed Plaintiff's grievance in a perfunctory manner, and knowingly used conflicted counsel throughout the entire process.

120.　　After 18 months of preserving, processing, and escalating Plaintiff's grievance to a PAC, APA abruptly refused to arbitrate it at System Board of Adjustment; despite Plaintiff's multiple written request to do so.

121.　　APA, is a covered entity under the ADA, and also failed its statutory duties under it, by refusing to assist with Plaintiffs written requests for a reasonable accommodation.

122.　　Unless APA's breaches of their duty are rectified, the Plaintiff will continue to suffer substantial damages stemming from his lost rights to under the RLA , including but not limited the loss if his right to have his grievance arbitrated, which can provide "make whole" remedies of back pay and benefits, reinstatement to the pilot seniority list, or forward pay and benefits in lieu of reinstatement.

123.　　*"While agreement is not compulsory, the steps required under the RLA are. In the event that either party refuses to follow the plain mandate of Congress, and breached the duty which Congress has impose upon it. <u>Injunctive Relief, is required to "vindicate the processes of the Railway Labor Act",</u> Brotherhood Railroad Trainmen v. Chicago River & Indiana R.R Company 353U.S (1957). at page 4177S.Ct. at page 641), "without which the act would be a nullity." American v. ALPA,* 1969F Supp. 777. (1958) (Emphasis added.)

124.　　Finally, the federal court in *Capraro v. United Parcel Service Co.* 993 F.2d 328 (3rd Cir. 1993), held that, *"if an air carrier* [or representative] *refuses to participate in a*

*Board of Adjustment proceeding, by refusing to hear an employee's individual claim, that employee is entitled to a judicial order compelling arbitration.*" (Emphasis added).

125.     Accordingly, the **Plaintiff respectfully seeks this Court to compel both Defendants to submit plaintiff's grievances to the American/APA System Board of Adjustment (SBA) for a hearing and final and binding resolution by a neutral arbitrator.**

126.     Resolution by the neutral, rather than majority vote by the SBA, is required given American Airlines unethical and fraudulent treatment related to Plaintiffs disability and termination, coupled with APA's animus and hostility.

### VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Lawrence Meadows, prays for a judgment against the Defendants for the relief as plead herein, and for such other equitable relief as this Honorable Court deems just and proper.

Dated: this 18th day of February, 2014                    Respectfully submitted,

Lawrence M. Meadows
PRO SE
Po Box 4344
Park City, UT 84060
Telephone: (516) 982-7718
Facsimile: (435) 604-7850
lawrencemeadows@yahoo.com

## VERIFICATION

I, Lawrence M. Meadows, declare as follows:

I am on the Plaintiff in the above-entitled action. I have read the foregoing complaint and know the contents thereof. With respect to the causes of action alleged by me, the same is true by my own knowledge, except as to those matters which are therein stated on information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the state of Utah that the foregoing is true and correct.

Date: Feb. 18, 2014, _____
Lawrence M. Meadows

VERIFIED COMPLAINT